Commonwealth v. Libran.

COMMONWEALTH vs. RAMON LIBRAN.

Suffolk.   May 1, 1989. — August 23, 1989.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Constitutional Law*, Admissions and confessions, Waiver of constitutional rights, Confrontation of witnesses. *Waiver. Evidence*, Other offense. *Practice, Criminal*, Severance, Instructions to jury. *Mental Impairment*.

The judge at a murder trial correctly concluded that the defendant's statements to the police after his arrest were made after a knowing and voluntary waiver of his Miranda rights, and were admissible in evidence. [638-639]

The judge at a murder trial correctly concluded that the defendant suffered no mental impairment that caused him to make admissions overheard by another prisoner in the police lockup shortly after his arrest, thus those statements were admissible in evidence. [639-640]

Evidence at a murder trial that the defendant had fought with another person the night before the murder was relevant to both the issue of the defendant's sanity as well as his state of mind (premeditation) and was correctly admitted for the jury's consideration. [640-641]

At a 1986 murder trial, any error in admitting statements of nontestifying codefendants at a joint trial, in reliance on the then applicable principles of *Commonwealth* v. *Bianco*, 388 Mass. 358 (1983), was harmless beyond a reasonable doubt where the statements did not contribute to the verdict or were merely cumulative of other evidence properly before the jury and could not have influenced the verdict. [641-644]

At a murder trial, the judge properly denied the defendant's motion to sever his trial from his codefendants' on the ground of mutually antagonistic defenses, where the defendant's assertion of the insanity defense was not irreconcilable with the codefendants' argument that they did not share in the defendant's intent. [644]

In a murder case, there was no reversible error in the judge's refusal to instruct on the issue of the effect of the defendant's mental impairment on his ability to form malicious intent, where the jury was instructed to consider the evidence of voluntary intoxication and mental impairment on the issue of deliberate premeditation and they returned a verdict of guilty of murder in the first degree. [645]

INDICTMENTS found and returned in the Superior Court Department on February 14, 1985.

The cases were tried before *John T. Ronan,* J.

*Daniel J. O'Connell, III,* for the defendant.

*Laura Callahan Burnham,* Assistant District Attorney, for the Commonwealth.

NOLAN, J. The defendant, Ramon Libran, appeals from his convictions of murder in the first degree and assault and battery by means of a dangerous weapon. The defendant conceded that he fatally stabbed Michael Maronski and was involved in attacks on two other people, but contended that he was not criminally responsible for his actions. The defendant was accompanied the night of the murder by three young men (codefendants), who were tried with him as joint venturers.[1]

The defendant asserts error in (1) the denial of his motion to suppress; (2) the admission of evidence of his prior misconduct; (3) the denial of his motion to sever his trial from that of his codefendants and (4) the judge's refusal to instruct the jury that they could consider evidence of mental impairment in determining whether the defendant had acted with malice. The defendant filed a motion for a new trial in the Superior Court. He also moved for a new trial in this court. The motion for a new trial was not acted on in the Superior Court. We referred the matter to a single justice of this court on whose recommendation we issued an order that the defendant's motion "is to be considered with the appeal presently pending" before the court. The defendant asks this court to exercise its power under G. L. c. 278, § 33E (1986 ed.). We affirm the convictions and decline to exercise our power under G. L. c. 278, § 33E.

We summarize the evidence. On December 21, 1984, there was a function at an American Legion hall in Chelsea. Vincent Russo (Russo) testified that a fight broke out there between the defendant and Vincent's brother, Victor. Russo said he pulled the defendant away from Victor and then the defendant began fighting with him. Russo further testified that the defendant waved a jackknife at him, but that the defendant later passed

---

[1] See *Commonwealth* v. *Cunningham, post* 646 (1989).

the knife to a friend before the police arrived. A police officer "started to frisk" the defendant, but found no weapon.

The next evening, an automobile driven by Leo Cunningham "cut off" an automobile driven by Richard Cipollone, forcing Cipollone to stop his automobile. Deborah Cronin and Dennis Bankus, two occupants of Cipollone's automobile, testified to essentially the same story: four young men piled out of Cunningham's vehicle and grouped themselves around the front of Cipollone's automobile. The defendant approached the driver's side of the vehicle and asked if one of the passengers was the "kid" he had fought at the American Legion hall the night before. After Bankus denied being there, the defendant said, "Sorry, wrong people." Then, according to Cronin, he said to Michael Riley, "These aren't the kids we are looking for, and when we find them, they are going to pay for it."

At 11 P.M., Leo Cunningham drove to meet his girl friend, Margaret McClellan, at work. McClellan said that the defendant, Michael Riley, and Louis Riley were in the back seat. The four young men were talking about a fight the night before and about finding the people who had jumped the defendant in the fight. McClellan testified that the defendant on one occasion and Louis Riley on another stopped a pedestrian to ask if he knew where Stephen Meiggs or Vincent Russo were. The second individual told them the location of a party, so they proceeded there.

Richard Mucci told the jury that he was just leaving a family party on Burma Road when Cunningham maneuvered his automobile in front of Mucci's. The defendant and his three codefendants approached Mucci. The defendant grabbed Mucci by the throat with one hand and squeezed hard. With his other hand, the defendant stuck a knife against Mucci's stomach. Louis Riley pinned one of Mucci's arms behind him and held a small knife against his cheek. The defendant said, "Meiggs, Maronski, Borum, and Westmoreland, tell these guys I want to kill them, whoever I find first I am going to kill them." Mucci answered, "You know where they hang, You seen them before . . . ."

At approximately midnight, the defendant and the codefendants were driving along Webster Street when the defendant told Cunningham to stop because he had spotted Meiggs. Meiggs was walking down Webster Street with his friends, Christopher Borum and Michael Maronski. Meiggs testified that four people got out of Cunningham's automobile. Two of the four started coming toward Meiggs, Borum, and Maronski. Borum and Maronski began to retreat while Meiggs stood where he was.

Meiggs testified he saw the defendant run after Borum and Maronski. Borum said he turned as he was running and saw the defendant holding a knife in one hand, while he grabbed and pulled at Maronski's jacket with the other hand. He told the jury that Maronski pleaded with the defendant to let him alone; Maronski was able to squirm away from the defendant and began running again. Borum ran into his house and called the police. Soon after, he saw Maronski coming toward his house, no longer wearing a jacket, and bleeding profusely. Maronski died from a massive acute hemorrhage caused by a stab wound perforating his liver and right lung.

Meiggs testified that he and Louis Riley stared at one another until the defendant came running back toward them, with a knife in his hand. Someone punched Meiggs in the face and he stumbled back against a house. Then Louis Riley sliced Meiggs's left cheek with a knife. Meiggs said he did not see where the two other individuals who exited the automobile had gone.

According to McClellan, Leo Cunningham yelled for the other defendants to return to his vehicle. Libran had cut his hand and wrapped his jacket around it. When Libran got into the vehicle he told the others he had stabbed someone five or six times. McClellan heard Michael Riley say, "I don't believe you. You shouldn't have stabbed him."

Cunningham drove the defendant and the Riley brothers to their street and they all departed from the vehicle. Louis Riley and the defendant then went to Massachusetts General Hospital for treatment of the defendant's hand wound. Meiggs was at the same hospital, where his face wound was being stitched.

A Chelsea police sergeant was also at the hospital, responding to a complaint that "there was a second stab victim up there." Meiggs recognized Riley and Libran and told the sergeant. The defendant and Riley were arrested at the hospital.

Libran was tried as the principal actor in the deliberately premeditated murder of Maronski and the assault by means of a dangerous weapon on Mucci. For the assault on Meiggs, he was charged on a joint-venture theory.

1. *Motion to suppress.* The defendant moved to suppress his statements to police, made after his arrest, and after receiving the Miranda warnings. He offered a psychiatrist's testimony that the defendant was mentally retarded and suffering from a combination of schizophrenic reaction and a manic depressive condition at the time of the incident and thus lacked the mental capacity to make a voluntary and intelligent waiver of his Miranda rights. The defendant also offered Cunningham's testimony that the group had been drinking beer and peppermint schnapps and were "pretty buzzed."

After the police informed the defendant that he was charged with assault with intent to kill and gave him the Miranda warnings, the defendant said that he was stabbed by three people who stopped him as he walked along Cherry Street. Louis Riley, who was kept in a separate room, told police the same story. When the police learned that Maronski had died, they informed Louis that he was now charged with murder and advised him again of his rights. Louis changed his story and told police that the defendant had stabbed Maronski. He admitted that he cut Meiggs's face. The police then brought the defendant back for questioning, advised him again of his rights and told him that he was charged with murder. The defendant then declined to speak, and asked for an attorney. Later that morning, while being fingerprinted, the defendant said, "You better get the other two, I don't want to take this whole rap myself. . . . [i]t was Louis' brother, Michael, and the other guy was Leo."

The Commonwealth did not rebut the testimony on the defendant's mental capacity at the hearing on the motion to suppress. However, even if the judge accepted as a fact that a

defendant was suffering from mental retardation and mental impairment, it does not follow that the judge must rule that the statements were involuntary per se. See *Commonwealth* v. *Vazquez*, 387 Mass. 96, 100 (1982). A statement is inadmissible if it would not have been obtained but for the effects of the confessor's mental disease. *Id.*, quoting *Gibbs* v. *Warden of Ga. State Penitentiary*, 450 F. Supp. 242, 244 (M.D. Ga. 1978), aff'd, 589 F.2d 1113 (5th Cir. 1979). After a hearing, the judge concluded that any mental impairment that the defendant suffered did not impede his ability to waive his Miranda rights and make a voluntary statement. The judge found that the defendant understood his rights, that he appeared sober and composed when questioned and that his answers were clear and appropriate. The defendant did not manifest any bizarre demeanor or unusual behavior. The judge found that the defendant's first statement was exculpatory and virtually identical to an obviously fabricated statement given by Louis Riley. The judge found that, when the police told the defendant that Maronski had died, the defendant showed an awareness that speaking to the police could be harmful by choosing to remain silent and to seek an attorney's help.

In reviewing a judge's determination that a voluntary waiver was made, the judge's subsidiary findings will not be disturbed unless there is clear error. *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982), and cases cited. We give substantial deference to the judge's ultimate findings. *Commonwealth* v. *MacNeill*, 399 Mass. 71, 76 (1987). We make our own determination whether the judge correctly applied the law to the findings of fact. *Id.*

In light of the totality of the circumstances, *Commonwealth* v. *Daniels*, 366 Mass. 601, 606 (1975), the judge correctly concluded that the defendant's statements were the product of an effective Miranda waiver and that such waiver was voluntary and intelligent beyond a reasonable doubt.

The defendant also argues that the judge erred in refusing to suppress the statements he made shortly after his arrest that were overheard by John Toolan, another prisoner. The defendant does not assert that Toolan was a police agent, nor does

he contend that Toolan coerced him to speak. He argues that his statements were not voluntary because of his mental impairment.

"Where there is no police connection with the private citizen to whom a defendant makes an admission, there is no Sixth Amendment barrier to the introduction of that evidence." *Commonwealth* v. *Rodwell*, 394 Mass. 694, 698-699 (1985), citing *Commonwealth* v. *Mahnke*, 368 Mass. 662, 676-678 (1975), cert. denied, 425 U.S. 959 (1976). Statements made to a private citizen can be suppressed, however, if the private citizen's actions violated the defendant's due process rights under the Fourteenth Amendment to the United States Constitution. *Commonwealth* v. *Mahnke*, *supra* at 679. If a defendant's mental impairment caused him to make admissions to a private citizen, the due process standard of voluntariness would be violated if the admissions were not suppressed. See *id*. The judge found no such mental impairment. The judge found that Toolan overheard the defendant ask Riley about his disclosures and seek his advice and opinions about "saying the wrong things." The judge found that the defendant's statements revealed a clear understanding by the defendant of his circumstances and that they were voluntary beyond a reasonable doubt. He ruled that the statements were therefore, admissible. We find no error in these findings and rulings.

2. *Motion in limine*. The defendant contends that the evidence relating to the fight at the American Legion hall should have been excluded because it was not relevant to his sanity or his state of mind the next evening, and its probative value, if any, was outweighed by the prejudice to his case.

Evidence of prior misconduct is not generally admissible to prove bad character or a propensity to commit crimes. *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269 (1982). If such evidence is relevant for some other purpose, such as proving the existence of a plan or scheme, motive, knowledge or state of mind, it is admissible. *Commonwealth* v. *Imbruglia*, 377 Mass. 682, 695 (1979). If the evidence is of questionable relevance, it should be excluded unless its probative value outweighs its prejudicial effect. *Commonwealth* v. *Blow*, 362 Mass. 196, 201 (1972).

The defendant asserts that Russo's testimony about his using a knife and then disposing of it at the American Legion hall is not relevant to the question whether he was sane the following night. The defendant also contends that Russo's testimony is of questionable veracity since his statement that the defendant passed the knife to a friend is uncorroborated, and Russo did not tell the police about it that night. The Commonwealth argues that the incident was relevant since it showed the defendant to be aware of the consequences and criminality of his actions, and that Russo's credibility was for the jury to assess.

The defendant argues that the evidence was not relevant to the issue of his state of mind the following evening. The Commonwealth contends that the testimony about the fight was relevant to whether the defendant premeditated the homicide, since there was ample evidence that the defendant devoted several hours to locating the people who had fought with him the night before.

We conclude that the judge did not err in admitting this testimony, for it was relevant to both sanity and state of mind.

3. *Motion to sever.* The defendant raises two arguments claiming he should have been tried separately. First, he charges that his right to confront his accusers under the Sixth Amendment to the United States Constitution was violated when the judge admitted the statements of his codefendants. Second, he contends the judge erred in refusing to sever the trials where the defenses were antagonistic.

The United States Supreme Court in *Bruton* v. *United States*, 391 U.S. 123 (1968), held that a codefendant's statement implicating a defendant should not be admitted unless the codefendant testifies at trial and thus is subject to cross-examination. The Court was concerned with the devastating impact and suspect credibility of such statements, as well as the jury's inability to heed limiting instructions.

The judge below relied on *Commonwealth* v. *Bianco*, 388 Mass. 358 (1983), in deciding that the defendant's Sixth Amendment rights would not be violated by admitting the statements of his nontestifying codefendants. In *Bianco, supra* at 366, this court applied the reasoning of the United States

Supreme Court plurality in *Parker* v. *Randolph*, 442 U.S. 62 (1979), and held that no Sixth Amendment violation occurs in admitting the statement of a nontestifying codefendant if the defendant has made admissible statements that are as incriminating as those made by the codefendant.

The Supreme Court has since rejected the plurality view of *Parker* v. *Randolph. Commonwealth* v. *Dias, ante* 131, 135 n.3 (1989). In *Cruz* v. *New York*, 481 U.S. 186, 193 (1987), the Court held that, "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against [him] . . . the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him" (citation omitted). The Court reiterated in *Cruz* that a violation of the confrontation clause can be harmless in some circumstances. *Id.* at 194. Thus, even though the judge admitted the codefendants' statements at their joint trial using legal reasoning that no longer applies, the admission may still be considered harmless error. *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 (1987). The test is whether any "spillover" from imperfectly interlocking statements by codefendants is "without effect on the jury and did not contribute to the verdict." *Id.*, quoting *Commonwealth* v. *Marino*, 375 Mass. 510, 521 (1978). This court must be convinced, after applying this test, that the *Bruton* error was harmless beyond a reasonable doubt. *Commonwealth* v. *Sinnott, supra.*

Each of the codefendants made statements to the Chelsea police after his arrest. Trial witnesses provided many of the same details as these statements except that none of the trial witnesses testified to direct knowledge as to how and when the defendant came to be armed with a knife. Leo Cunningham told police that he gave the defendant the murder weapon the afternoon of the crime. Michael Riley stated that the defendant grabbed the knife just before the attacks on Meiggs and Maronski. Louis Riley said that Cunningham gave the defendant the knife just before the attacks.

The defendant argues there was no other evidence as to how he armed himself. The defendant also asserts that his codefendants' statements contained indirect references to his mental state that could have led the jury to infer that he was the group leader and that he was seeking revenge. He contends that these statements undermined his insanity defense because the jury may have used them as evidence of sane and rational premeditation. We must determine whether the incriminating portions of the codefendants' statements that do not interlock with the defendant's statement could have had any effect on the verdict. *Commonwealth* v. *Sinnott, supra.* In assessing this, one important factor is whether the admitted evidence was "merely cumulative" of evidence properly before the jury. *Id.* at 872 n.8.

It is true that no other trial witness testified to direct knowledge of how and when the defendant obtained a knife, and thus the statements were not cumulative of other evidence. Whether evidence is cumulative is not, however, the only means of deciding whether an error is harmless beyond a reasonable doubt. The United States Supreme Court has listed a number of factors for an appellate court to consider in determining whether an error is harmless beyond a reasonable doubt, and one factor is the importance of the improperly admitted testimony to the prosecution's case. *Delaware* v. *Van Arsdall*, 475 U.S. 673, 684 (1986).[2] The time and manner in which the defendant obtained a knife was not important to proving

---

[2] The other factors suggested for determining whether an error is harmless beyond a reasonable doubt are whether the improperly admitted evidence was "cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware* v. *Van Arsdall, supra.* Reviewing these factors only strengthens the conclusion that the error was harmless, because the prosecution had ample admissible evidence from which the jury could infer that the defendant was sane: the witnesses' accounts of how he was involved in a fight the night before, how he searched various parts of Chelsea looking for those who had attacked him, how he stopped and questioned several people about the location of those he wished to find and how he behaved after he was arrested. The jury also had before them an expert's testimony that the defendant was criminally responsible under the *McHoul* standard at the time of the incidents. *Commonwealth* v. *McHoul,*

whether he was sane or whether he premeditated the killing, but rather was inconsequential on both points.

Finally, the "indirect references" in the codefendants' statements that the defendant was the ring leader and that he was seeking revenge represented cumulative evidence. Five eyewitnesses described Libran as the one who stepped up to inquire about the whereabouts of the people who had fought him the night before. We are satisfied the admission of the codefendants' statements was harmless beyond a reasonable doubt.

The defendant's argument that he deserved a separate trial because his defense and that of the others were mutually antagonistic is also unpersuasive. In *Commonwealth* v. *Moran*, 387 Mass. 644, 659 (1982), the assault was witnessed by no one but the defendants, and each accused the other of committing the crime. One of the defendants necessarily was guilty. In that instance, the court deemed the defenses to be mutually antagonistic and irreconcilable and thus the prejudice to each defendant was compelling. *Id.* at 659. See *Commonwealth* v. *Dias, supra.* That was not the case here, where the defendant used the defense of insanity and his codefendants argued they did not share in the defendant's intent. The defendant argues that defense counsel for the other defendants introduced evidence and made closing arguments suggesting that the defendant was sane. While each counsel did try to stress Libran's involvement over that of each codefendant, his focus was not to prove the defendant sane, but to prove that his client did not share Libran's intent. These defenses were not mutually exclusive. The judge did not abuse his discretion in refusing to sever the defendant's trial.

---

352 Mass. 544, 546-547 (1967).

There was also strong evidence of premeditation. The occupants of Cipollone's vehicle and Richard Mucci testified that the defendant was stopping people to look for those individuals who previously had fought him. Mucci also testified that the defendant threatened him with a knife, permitting the inference that the defendant possessed a knife before his attack on the victim. Further evidence of premeditation was presented to the jury by Margaret McClellan, who had joined the codefendants approximately one hour before the homicide, and said that Libran was looking for certain people.

4. *Jury instructions.* The defendant contends that the judge erred in refusing to instruct the jury that the defendant's mental impairment could be considered in determining whether he was able to form malicious intent. At the time of trial, we had not yet decided *Commonwealth* v. *Grey*, 399 Mass. 469, 470-471 (1987), in which we ruled that a jury could consider the significance of a defendant's mental impairment on the proof of malice.

"Retroactive application of a rule of criminal law is indicated if (1) a case is on direct appeal or as to which time for direct appeal has not expired when the new rule is announced, and (2) the issue was preserved at trial." *Commonwealth* v. *Bellamy*, 391 Mass. 511, 515 (1984). Both elements of this rule were satisfied here. The failure to instruct was not reversible error, however, because the judge did tell the jury they could consider evidence of voluntary intoxication and mental impairment in deciding the question of deliberate premeditation, *Commonwealth* v. *Costa*, 360 Mass. 177, 185-186 (1971), and the jury, nevertheless, convicted the defendant of premeditated murder. *Commonwealth* v. *Glass*, 401 Mass. 799, 810 (1988). The jury considered Libran's evidence of impairment and were not persuaded. Therefore, any error in the instruction was not prejudicial.

5. *G. L. c. 278, § 33E.* We have exercised our powers of review under G. L. c. 278, § 33E, and conclude that the interests of justice require neither a new trial on the murder indictment nor the entry of a verdict of a lesser degree of guilt than that found by the jury.

*Judgments affirmed.*