Commonwealth *v.* Maimoni.

COMMONWEALTH *vs.* THOMAS MAIMONI.

No. 94-P-1417.

Essex. April 18, 1996. - September 19, 1996.

Present: GREENBERG, KAPLAN, & LENK, JJ.

*Evidence,* Prior misconduct, Photograph, Relevancy and materiality, Inability to obtain evidence. *Homicide. Practice, Criminal,* Venue, New trial, Assistance of counsel. *Attorney at Law,* Conflict of interest. *Malice.*

At a murder trial, the judge properly admitted evidence of the defendant's aggressive sexual conduct toward two women prior to the murder of the female victim, where the evidence was relevant to the issues of the defendant's credibility and his mental state at the time, and where the evidence could support an inference of a plan or pattern of conduct. [327-328]

At a murder trial the judge properly admitted in evidence certain photographs of the victim's remains which showed directly the circumstances of the death or helped in assessing the injuries. [328-329]

In a murder case, the defendant did not demonstrate that there was any specific material from the crime scene that had exculpatory potential that may have been lost or destroyed by the presumed neglect of the police. [329-330]

At the trial of a murder indictment, there was no error in the judge's failure to give an instruction to the jury on his own initiative on involuntary manslaughter where the evidence did not provide any basis for such an instruction. [330-331]

At a murder trial the judge did not abuse her discretion either in denying the defendant's motion for a change of venue based on pretrial publicity [331-332], or in denying the defendant's motion to try first the issue of guilt and then to try the issue of criminal responsibility [332].

The judge who considered a motion for new trial in a murder case properly denied the motion without a hearing where there was no evidence in support of the motion of an alleged conflict of interest of the defendant's trial counsel that amounted to ineffective assistance of counsel. [332-333]

In a first degree murder case in which the defendant was convicted of second degree murder, the jury's implicit finding of malice was supported by the evidence, and the judge did not err in denying the defendant's motion for a new trial raising the issue of the sufficiency of the evidence on the element of malice. [333-335]

At a murder trial there was no ineffective assistance of counsel demonstrated by trial counsel's strategic decision, agreed to by the defendant,

not to present a defense of lack of criminal responsibility, nor was counsel's performance in any other respect shown to be ineffective. [335-336]

INDICTMENT found and returned in the Superior Court Department on July 31, 1991.

The case was tried before *Patti B. Saris,* J., and a motion for a new trial, filed on May 3, 1995, was considered by *Robert A. Barton,* J.

*Stephen J. Weymouth* for the defendant.

*Robert J. Bender,* Assistant District Attorney (*Kevin M. Mitchell,* Assistant District Attorney, with him) for the Commonwealth.

KAPLAN, J. An Essex County grand jury on July 31, 1991, indicted Thomas Maimoni for the murder on July 12, 1991, of Martha Brailsford. A judge, after hearings in July and August, 1992, on October 16, 1992, denied the defendant's motion to suppress his statements. A number of other motions were heard by the trial judge ahead of trial and denied. Trial began on February 1, 1993, and ended on February 12 with a verdict of guilty of murder in the second degree; accordingly, the defendant was sentenced to life imprisonment. The appeal of the conviction to our court was stayed by us pending the preparation of certain transcripts. On May 3, 1995, the defendant, with fresh counsel, filed a motion for a new trial supported in part by affidavits. Meanwhile the trial judge had been appointed to the United States District Court, so the motion for new trial was assigned to another judge, who denied it on September 8, 1995, without taking testimony. The defendant's appeal from the denial of the motion for a new trial was briefed separately from the appeal from the conviction, but the two appeals were consolidated for oral argument. We deal with both appeals in this opinion.

*Summary of certain evidence.* We intend to give here a brief synopsis of so much of the voluminous evidence as will afford background for the legal questions raised on these appeals. Additional parts of the evidence will be mentioned when the particular questions require such amplification.

Brian Brailsford, captain for a cruise company that ran between Boston and Provincetown, arrived at his house in the Willows, a peninsular section of Salem, after dark, Friday, July 12, 1991. His wife Martha was not there, and the house

gave evidence that she had not been at home for some hours — her artwork had not been brought in from outdoors. Brian waited and became alarmed. At 1 A.M., Saturday, he called the Salem police but was told to stay put. He began walking the neighborhood by flashlight, and made a second tour at dawn. Recalling that Martha had had some early morning walks with Thomas Maimoni (the defendant), Brian went at 7 A.M. to the defendant's nearby apartment and, finding no one there, went to the Palmers Cove Yacht Club, where he saw the defendant's "Cal" twenty-eight foot sailboat "Counterpoint" in its slip, but the defendant was not on hand. Finally, around 8 A.M., he found the defendant at the apartment.

Brian introduced himself as Martha's husband and said Martha was missing. He said he understood the defendant had walked with her the previous morning. The defendant said that was so, but she had parted from him and walked on with friends. Brian asked whether Martha had sailed with him. The defendant said no, he had not sailed at all on Friday, he would not sail alone with Martha but would invite Brian to come along and might bring a girlfriend on his own. He said he would pray for Martha.

Salem Detective Conrad Prosniewski interviewed the defendant later that Saturday morning. The defendant said he had last seen Martha at 7 A.M. Friday, had not sailed with her, and wouldn't sail alone with her because he was married and it wouldn't look good.

The police soon established that Martha had boarded Counterpoint around 1 P.M. Friday at Willows pier.

The defendant was away in Rhode Island during the weekend. On Monday, July 15, Prosniewski got in touch with the defendant and that evening the defendant met with that officer and Detective Urbanowicz. They gave him his Miranda warnings. Prosniewski said, if the defendant wanted to say Martha didn't get on the boat at Willows pier, he could just walk out; if he wanted to tell the truth, he could sit down and tell it. The defendant after a pause said, "She was supposed to bring her husband." He said Martha was to meet him on the boat at 1 P.M. at Willows pier to talk about her résumé; he brought the boat from Palmers Cove to Willows pier, but it was crowded and he could not tie up; so Martha had just jumped aboard, and he motored the short distance to

a landing at Winter Island (part of Willows), where she went ashore at a place on her regular walking route. He had gone on and moored near the Yacht Club. He had been at the Club until 6 P.M. when he went home.

The police through the harbormaster attempted to find people who had been at the Winter Island landing at the assumed time, and on Tuesday afternoon, July 16, Prosniewski reached Dr. Ronald Plotka, a dentist, who as it happened had had Martha as a patient over the past ten years. Plotka said he had been at the landing from noon to 2 P.M. and had not seen Martha.

At this stage, the State police were notified for assistance. Prosniewski invited the defendant to come in for another interview, and he arrived at the station accompanied by his father-in-law, Charles Stochl. State Trooper Mark Lynch was also in attendance. The defendant repeated in effect his previous story. With Stochl out of the room, the officers mentioned Dr. Plotka, and told the defendant flatly they didn't believe the story he was telling them.

Now the defendant offered a third version of the events of Friday. He said he had sailed with Martha as far out as Gloucester. It was approaching sunset. Starting to jibe for the trip back to Salem, he depowered and brought down the mainsail. The headsail became fouled. Martha was trying to help. Then a rogue wave or two struck. Her face hit the mast. She grabbed for the headsail and went overboard.[1] She was down and drowned before he could spot her. He "froze" and didn't call the Coast Guard. The defendant marked on a chart for the police the place where Martha had drowned; it was about nine miles from Children's Island (also called Cat Island). He said he would take the police to the spot. He regretted not telling the story earlier: he feared that Patricia, his wife — who was in Kansas visiting her mother — would find out about his having a woman aboard.

The police deferred motoring to the designated location.

On Thursday about noon, the defendant and his wife, who had flown in from her Kansas visit, were in Beverly with friends, the McCarthys. The four heard the news report that

---

[1]Her bag somehow fell overboard at the same time. To friends, the McCarthys, the defendant said on Wednesday that he had thrown Martha her bag hoping she would catch it.

a body had been found. The defendant said he was going to see his lawyer and drove off alone. The following Saturday, July 20, he was arrested in northern Maine near the Canadian border for breaking into a cabin. A backpack of camping goods was found in the car together with maps and a compass. He had left his wedding ring with a note indicating how Patricia could be reached.

Early that Thursday morning William Hooper Goodwin began bringing up his lobster traps near the southeast end of Children's Island. As the last trap in one line of traps came to the surface, Goodwin saw an anchor tangled into the trap. Trailing from the anchor was a twelve-foot rope tied by knots to the ankle of a body, naked, so scavenged as to amount almost to a skeleton. A buckled diver's weight belt was around the figure between the pelvic bones and the rib cage. The remains were identified as Martha's.

Martha had had excellent ("perfect") teeth as of Plotka's examination three months before the death. Postmortem examination showed a chip on the inside surface of a lower left molar, an injury that the person would feel immediately; also a loosened lower left front tooth. There was professional testimony that the fracture of the molar was caused by a force from below the jaw and the loosening of the front tooth by a direct force or a force from below the chin. The head, top and front, had suffered three impacts, the most serious, on the top of the forehead (with bleeding under the scalp), was probably inflicted shortly before death. The two other injuries involved little force. None of the three could have caused death, but each would be felt and could have dazed the person. There was expert testimony that Martha had died of drowning (see note 13, *infra*).

The defendant testified at trial to a fourth story. They had sailed well out. There was no sexual involvement or quarrel or altercation. Around sunset, as they were making to come home, rogue waves (perhaps the wake of trawlers in the distance) struck the boat. Martha, coming from the foredeck to the cockpit, struck her face on the mast. Another wave struck, and she was cast overboard. He saw her in the water swimming toward the boat. He could not make eye contact with her and so did not throw a floatation device. Instead, he tried to maneuver the boat with its swim ladder toward her. She did not seize it. Quickly, he donned the top part of his

wet suit, stepped down the ladder and grabbed hold of Martha. With much effort he worked her on to the deck. She appeared to him to be unconscious. He tried to revive her, applying CPR and mouth-to-mouth resuscitation. He worked against hypothermia by removing her wet clothes and wrapping her in towels. He realized she was dead when her body released urine. He was in a panic. He could not abide the body on the boat. In the end, he motored to Children's Island, brought up an anchor and a diver's belt from below, weighed the body down with anchor and belt, and threw the mass into the water. He said he was incapable throughout of a better response, such as using the radio for help. He got to shore and home well after midnight.

## APPEAL FROM JUDGMENT

*Bad acts.* The Commonwealth gave notice before trial that it intended to offer testimony about three episodes in which the defendant made sexual advances to women in the week of Martha's death. The defendant moved in limine to exclude the testimony as impermissible evidence of bad acts. The trial judge conducted a pretrial evidentiary hearing. She concluded that the two episodes preceding the death should be admitted, but the third, which occurred thereafter, should be excluded. And the trial followed suit. The two women testified.

Roxcy Platte, July 8. When Platte first met the defendant, he told her his wife had died of cancer.[2] He invited Platte to go sailing on his boat. The sail on July 8 was their fourth. In the course of it he suddenly became "very sexual" and described sexual encounters that he had had with other women on the boat. He dropped his bathing trunks and sailed in the nude with an erect penis. Platte faced away from him. Returning to shore, he said they should not make a big deal of it.

Rosemary Farmer, July 9 or 10. The defendant invited Farmer aboard the boat on the pretext of his being interested in buying her house. After palaver at the dock, he asked if she would like to go for a sail. As they motored out, he said

---

[2]The defendant's marriage to Patricia was his fourth, although Patricia evidently believed it was his second. None of the wives had died.

The defendant admitted to having repeatedly cooked his record in applying for jobs, falsely claiming educational and other credentials. He had a spotty employment record and in July, 1991, could be called half unemployed.

that his wife had died of cancer that year. He touched her repeatedly, started to put his hands down her pants and under her shirt. When he anchored (near Graves Island), she asked to be taken back. He said, "How modest are you," dropped his pants, put on a wetsuit and swam, was naked again as he dried himself. In the galley below, he grabbed her around the waist and tried to pull her into the sleeping cabin. She resisted. As she took the stairs to reach the deck, he dropped his shorts again and held her for minutes before releasing her. On deck, she sat in the stern and said if he touched her again she would go overboard. He took a direct route home.

Evidence of a person's particular "bad acts" may not be offered to prove his bad character or propensity to commit crimes, but it may be introduced "for other relevant purposes." *Commonwealth* v. *Fordham*, 417 Mass. 10, 22 (1994). The evidence of the episodes just summarized was (in part at least) admissible on the Commonwealth's behalf for the elementary purpose of countering the defendant's protestations following Martha's disappearance that he would not sail accompanied only by a woman not his wife. Further, the evidence could support an inference of a plan or pattern of conduct to bring women aboard for sexual adventure, see *Commonwealth* v. *Gallison*, 383 Mass. 659, 672-673 (1981); *Commonwealth* v. *King*, 387 Mass. 464, 469-473 (1982); *Commonwealth* v. *Barrett*, 418 Mass. 788, 793-794 (1994), and here the house-buying pretext or enticement in Farmer's case could find a counterpart in the defendant's own testimony that the (ostensible) purpose of the agreed meeting with Martha on the boat at Willows pier was to discuss Martha's resumé. Still further and most important, the episodes could be taken as illustrative of the defendant's mental state at the time, see *Commonwealth* v. *Scott*, 408 Mass. 811, 819-820 (1990)[3] ; see also *Commonwealth* v. *Rancourt*, 399 Mass. 269, 275-276 (1987); *Commonwealth* v. *Phinney*, 416 Mass. 364, 375 (1993), here a mood of sexual aggressiveness (probably

---

[3]The *Scott* case is particularly instructive. A gagged dead woman was discovered in a wooded area with blows to the head and exposed breasts. Evidence that two to five days before the murder the defendant made sexual overtures to three other women, including physical threats toward one, was found admissible in proof of the defendant's guilt — "relevant to show the defendant's sexual frustration and thus his plan, motive, and intent to procure a sexual encounter at the time of the murder." 408 Mass. at 818.

The defendant cites *Commonwealth* v. *Yelle,* 19 Mass. App. Ct. 465

bred, as the judge suggested, of sexual frustration) leading to his staging sailing trips with women and extending to genital displays and, in Farmer's case, attempts at force aimed at physical seduction (with the woman being in effect imprisoned at the time on a sailboat miles offshore). We note also that as the defendant was himself offering (expert) testimony about his psychological makeup and his mental state at the time to explain and possibly condone his behavior toward Martha, his lies to the police, and his final flight, the Commonwealth was entitled in response to introduce evidence likewise bearing on mental state. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 227 (1986); *Commonwealth* v. *Libran*, 405 Mass. 634, 641 (1989).[4]

Evidence of a defendant's bad acts, which is otherwise admissible, should be excluded when its value for relevant probative purposes is substantially outweighed by the unreasoned prejudice it would engender in the triers. See *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 816 (1973); *Commonwealth* v. *Robertson*, 408 Mass. 747, 750 (1990). It is for the trial judge to make the measure, and the judge's decision will be respected unless palpably wrong. See *Robertson*, *supra* at 750. Here the trial judge in fact excluded a third episode: June Chappell, picked up by the defendant on July 14, with Martha two days gone.

The defendant, while mistakenly complaining of the admission of the bad acts testimony, does not complain of the judge's instructions (given when the evidence was introduced and again in her final instructions) about the limited use the jury might make of that testimony as admitted.

*Photographs.* In response to the defendant's motion in limine to bar all photographs of Martha's remains, the judge excluded

(1985). The sole issue in that rape trial was whether the victim consented. The defendant offered a ride to a young girl twenty minutes before offering the victim a ride. This evidence was properly excluded: the prior act "provided no evidence of force," as the court remarked in *Commonwealth* v. *Rancourt*, 399 Mass. 269, 276 n.9 (1987) (distinguishing *Yelle*), nor, we may add, did it suggest a modus operandi, so its probative value was "nugatory or nearly so." 19 Mass. App. Ct. at 471.

[4]In her memorandum discussing certain of her rulings on evidence, the judge suggested that because the episodes showed the defendant finally desisting, they might have helped the defendant avoid a jury finding of premeditated murder.

pictures of portions of the skull related to the face, these being of slight probative value, but she admitted five color photographs picturing the following: waist area with weight belt; knee to foot with attached anchor line; skin of the back (redacted to eliminate certain portions); wounded areas of the head shown by pulling back the scalp, but with little facial exposure (two photographs). Of the first two photographs we may say they showed directly the circumstances of the death. The photographs of the skin, which exhibited no scratches, responded (among other things) to the question whether the body was dropped elsewhere and dragged along the sea bottom. The two final photographs helped in assessing what the injuries were, how they came about, and their role in the death.

"[I]f . . . photographs possess evidential value on a material matter, they're not rendered inadmissible solely because they are gruesome or may have an inflammatory effect on the jury." *Commonwealth* v. *Berry*, 420 Mass. 95, 108 (1995). The judge sought to minimize prejudice by asking during jury selection whether the individuals could view unpleasant pictures and remain impartial, by making cautionary statements when photographs were admitted, and by excluding and redacting as noted. "The admissibility of photographic evidence is left to the discretion of the trial judge, and we will overturn the judge's decision only where a defendant is able to bear the heavy burden of demonstrating an abuse of that discretion." *Ibid.* The burden has not been carried here.

*Loss of potential evidence.* Through July 15, the defendant remained in control of Counterpoint. On July 16, as requested by the police, he signed a consent form, and the next day the police moved the boat from the Yacht Club to the Hawthorne Cove Marina. The defendant was then joint owner of the boat with his wife, Patricia. A team of four, including a police chemist, made a search; they found and seized a mainsail with blood stains,[5] a hand-held vacuum cleaner, and a book of ocean charts. Using a "limalite" on surfaces to detect blood or sperm, they found none. When, on the following day, July 18, the body was found, the police secured a search warrant and made a further search and seized additional

---

[5]The defendant and Martha had the same blood type. In his testimony the defendant intimated that the stains could have resulted from cuts on his hands or a nosebleed.

items. Nothing consequential turned up. On July 25, several days after the arrest, the police videotaped the exterior and interior of the boat, and on the same day they returned the boat to Patricia at her request. The defendant before arraignment signed over his interest in the boat (and other belongings) to Patricia. In August, 1992, Counterpoint was sold to a resident of Connecticut, and later, prior to trial, defense counsel located and examined it.

The defense moved to dismiss, complaining that the Commonwealth had failed to provide security tapes or other protection while the boat was at Hawthorne Cove, and had improvidently returned the boat to Patricia. Where the Commonwealth is thus accused of losing or mishandling evidence, "[w]hile the defendant need not prove that the evidence would have been exculpatory, he must establish 'a "reasonable possibility, based on concrete evidence rather than fertile imagination," that access to the [material] would have produced evidence favorable to his cause.' " *Commonwealth* v. *Willie*, 400 Mass. 427, 433 (1987). The defense makes no progress under *Willie* because it is unable to point to specific material with exculpatory potential that may have been lost or destroyed by the presumed neglect of the police (who, incidentally, are not accused of bad faith). Contrast *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15 (1993) (a rape case in which the victim had an abortion and the Commonwealth negligently authorized destruction of the fetus [depriving the defendant of the opportunity to establish nonpaternity through blood testing]).

*Failure to instruct sua sponte on involuntary manslaughter.* From the police interview of July 16, when he admitted that Martha had sailed with him, through his testimony at trial, the defendant was asserting that his relation with Martha was platonic, that he did not strike her, and that she fell overboard accidentally when the boat was staggered by waves (the story being elaborated at trial to account for the anchor and diver's belt). On appeal from the conviction, however, the defendant contends that the judge created a substantial risk of a miscarriage of justice, see *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967), when she omitted to charge (although not requested to charge) that the jury might find the

defendant guilty of involuntary manslaughter[6] — this on the hypothesis that he committed a battery upon Martha and unintentionally caused her to fall into the sea (what else is then supposed to have happened is left much at large). This would be mere hypothesis or theory for, besides being unmentioned at trial or in any claimed instruction, it has no adequate basis in the evidence received; for instance, the evidence does not suggest that the defendant committed a battery on the victim at a location on the boat that would put her at risk of going overboard. "Because the contention that involuntary manslaughter was a possible verdict rests on a hypothesis not supported by the evidence, there was no error in failing to charge [on it]." *Commonwealth* v. *Estremera,* 383 Mass. 382, 393 (1981). See also *Commonwealth* v. *Nardone,* 406 Mass. 123, 132 (1989). Indeed, "[t]he absence of a request for an instruction on involuntary manslaughter by the defendant's trial counsel . . . indicates that trial counsel was of the view that the evidence would not support a verdict of involuntary manslaughter." *Commonwealth* v. *Fitzmeyer,* 414 Mass. 540, 548-549 (1993). We add that the judge instructed the jury clearly and repeatedly that if the Commonwealth had not disproved beyond a reasonable doubt the proposition that death occurred by accident, they must find the defendant not guilty of murder. So also the judge charged properly on voluntary manslaughter. These instructions were fully protective of the defendant's rights on the evidence adduced.

*Other contentions.* Starting with the disappearance and the finding of the body and continuing through the trial some nineteen months later, newspaper and television coverage of the case was copious and little or none of it was friendly to the defendant. The trial judge was well aware of this: at the hearing on January 25, 1993, she said, "I don't need to be really persuaded [of the coverage] because I have personally seen the coverage and I know of the media interest." Nevertheless she denied the motion for change of venue from Essex

---

[6]"A verdict of involuntary manslaughter is possible 'only for causing an unintentional death (1) during the commission of wanton or reckless conduct, as defined in *Commonwealth* v. *Welansky,* [316 Mass. 383, 400 (1944)], or (2) during the commission of a battery, under the principles set forth in [*Commonwealth* v. *Sheppard,* 404 Mass. 774, 776 (1989)].' *Commonwealth* v. *Catalina,* 407 Mass. 779, 789 (1990). Involuntary manslaughter is a proper result only in quite particular factual scenarios." *Ariel A.* v. *Commonwealth,* 420 Mass. 281, 287 n.7 (1995).

County or in the alternative for the use of a venire from another county (subject to such possible resort if the local venire should be exhausted; in fact it proved sufficient). The response to pretrial publicity lies in the judge's discretion, see *Commonwealth* v. *Colon*, 408 Mass. 419, 435 (1990); in the present case the judge believed an impartial jury could be selected by questioning and winnowing of the individuals in the venire, by colloquies with those who were subsequently seated, and by admonitions to them with daily follow-ups. The judge acted impressively, and we think discretion was not abused.

The judge also stayed within her proper bounds, see *Commonwealth* v. *Blanchette*, 409 Mass. 99, 108 (1991), when she denied the defense motion to "bifurcate" the trial by trying first "the merits of the acts alleged" (as the defense put it) and then, if necessary, "the issue of criminal responsibility"[7] — this division being proposed lest "evidence of any prior psychiatric history and 'anti-social' behavior" should "undermine his credibility on the defense of accident as to the substantive crime." It will be enough to say that trial as a unit did not cause the defendant to abandon his claim of accident or (as far as one can make out) to dilute what strength it had. Compare *Commonwealth* v. *Scott*, 408 Mass. at 826-827.

## APPEAL FROM DENIAL OF MOTION FOR NEW TRIAL

*Conflict of interest.* The defendant was arraigned on August 2, 1991. On August 9, Mr. Jeffrey A. Denner filed notice of appearance as defendant's attorney. On August 22, at a time when, according to Mr. Denner, it was already apparent that the defendant was without resources or expectations to help in his defense, the attorney and the client entered into a lengthy agreement for legal representation in which the attorney's fee was fixed at $200,000, with a provision by which the attorney could receive payment from the exploitation after trial of movie and like opportunities.[8] On January 27, 1992, the attorney appeared before a judge of the Superior

---

[7]This may have been intended to take in not only a possible "insanity defense" but also any lesser claim of psychological disability.

[8]"In the event that the Defendant should decide after Trial that a movie, book and/or other media opportunities will be pursued, he explicitly will and does authorize the Attorney, Jeffrey A. Denner, to pursue same for his

Court (not the trial judge) seeking an allowance of funds to retain experts. The judge indicated that an allowance could be made if the attorney proceeded pro bono. The attorney agreed to do so, and the agreement of August 22 was in effect cancelled, as the defendant was aware. We are spared the need to criticize the terms of that agreement. As far as appears in the present record, the attorney, who tried the case to the end, has never received compensation.

Shortly after August 9, 1991, Joan Pinkham of "Fly By Night Productions" had communicated with the attorney about media treatment of the case, but there was no movement on this through the period of trial. In March, 1993 (after verdict on February 12, 1993), Pinkham resumed communication with the attorney and the attorney or his office was in the process of drafting a contract to be entered into with the defendant dealing with media rights. But shortly the effort was abandoned, and the attorney's representation of the defendant in the criminal case came to an end with the allowance on June 8, 1993, of his motion to withdraw.

The matter of a possible conflict of interest was presented in the form of affidavits to the judge deciding the motion for a new trial. No material issue arose, for, with the agreement undone and the attorney working pro bono, any conflict ended, cf. *Commonwealth* v. *Michel,* 381 Mass. 447, 454 (1980), and the posttrial happenings were inconsequential. Thus the judge could well have declined to hold an evidentiary hearing, see *Commonwealth* v. *DeVincent,* 421 Mass. 64, 67 (1995), and his negative finding on the merits was supported. In light of the finding, it may be superfluous to say there is no suggestion the attorney's loyalty to his client's interests was in fact impaired by the events described. Cf. *Commonwealth* v. *Fogarty,* 419 Mass. 456, 459 (1995).

*Malice.* The defendant did not raise at trial (or on the appeal from the judgment) the specific question of the sufficiency of the evidence on the issue of malice aforethought, an ingredient of murder. However, he attempted to argue the point on his motion for a new trial contending, in effect, that the motion judge should reduce the conviction to manslaugh-

(Denner's) own economic benefit, and further, that any unpaid monies toward the foregoing legal fees should be paid directly out of any proceeds derived from the said book(s), movie(s), etc. not already accruing to the said Denner."

ter[9] because the jury's implicit finding of malice was against the weight of the evidence.[10]

The defendant dwells particularly on the testimony of Dr. Harold J. Bursztajn, a forensic psychiatrist, called by the defense. The witness said the defendant suffered from "schizotypal personality disorder," a mental condition that made him respond to conflict by a process of make-believe: thus in a crisis he might believe that Brian Brailsford was on the way somehow to rescue the situation. In the witness's view, the defendant was incapable of violence, so Martha must have come to her death by accident; but if the defendant was an actor in the death, he could not have been acting with malice.[11] The jury might have sized up this testimony as obscure as well as weak; they were not bound to accept the witness's appraisal of the defendant's state of mind.

A theory of self-delusion could not overcome some harsh facts. Basing themselves on the evidence, the jury could see the situation in quite another way. They could disbelieve the defendant's story at trial of Martha's falling into the sea by accident and his attempting to rescue her. To begin, a slip and fall overboard was improbable for one with Martha's large

---

[9]The defendant was evidently not seeking an evidentiary hearing on the matter.

[10]"Malice aforethought may be shown by proof that the defendant, without justification or excuse, intended to kill the victim or to do the victim grievous bodily harm. See *Commonwealth* v. *Puleio*, 394 Mass. 101, 108 (1985). However, proof of such an intent is not required because malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act. *Commonwealth* v. *Chance*, 174 Mass. 245, 252 (1899). See *Commonwealth* v. *Starling*, 382 Mass. 423, 428 (1981); *Commonwealth* v. *Swift*, 382 Mass. 78, 83 (1980)." *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987).

[11]Among other claims that defendant's trial counsel was ineffective (see discussion below), the defendant argues that counsel was inept in questioning Dr. Bursztajn and so blunted the point of his testimony. We think counsel brought out clearly enough the essence of the testimony, such as it was, and the judge in her instructions stated plainly the question for the jury: "Now once again, in thinking about the issue of malice aforethought, you need to consider the defendant's mental condition . . . . [Y]ou must consider when deliberating on the question of malice whether because of Mr. Maimoni's mental condition, the defendant had the capacity to form the specific intent to kill or cause grievous bodily harm" (and so on). The judge spoke to the same effect in reinstructing at the jury's request.

experience with boats. Above all, the five different points of damage to Martha's head, including cracking and loosening of teeth, still exhibited in the remains, could persuade the jury that the defendant's account was simply false, like his earlier statements. The jury could find that there was an altercation between the defendant and Martha with repeated blows, as indicated, after which the defendant disposed of the body by heaving it, weighted, to the water at Children's Island. The defendant could have felt at the time that he had to remove and conceal the body (and then tell lies as need be), otherwise facts would come out, he would lose his wife and home, his lifetime of lies and dodges would stand revealed, and his modish but ever precarious existence would collapse.[12] Whether the defendant killed Martha before the unloading, or (more probably) dropped her still alive, though perhaps unconscious, is not answered with complete precision in the evidence.[13] But in any case the jury's implicit finding of malice, in the sense of the instructions given to them, is supported. The motion judge made no mistake.[14]

*Assistance of counsel.* The defense did not argue or request instructions at trial about the defendant's strict criminal responsibility — whether, as a result of mental disease or defect, the defendant lacked the ability to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law. See *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). There is argument on this account that defense counsel provided substandard lawyerly assistance to his client, which calls for a new trial in which the defen-

---

[12]On direct examination at trial, recounting his fourth scenario, the defendant himself described what he could have expected if he had brought the body to shore: "There is no way to measure the storm that would be directed towards me if I went straight in." And again, explaining his cover-up: "I didn't want to lose my house and I didn't want to lose my wife."

[13]The pathologists on both sides put the cause of death as drowning, but because the body had been submerged for six days, they could not be entirely sure of that conclusion. (In the conditions, a "diatom" test would not have been satisfactory, and was not conducted.)

[14]"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979).

dant would be well represented and the claim of criminal irresponsibility properly presented.

The omission to press an "insanity defense" was part of a planned strategy. At first, counsel considered following that route, but after review of the evidence available and consultation with experts, he took the decision to present the contention — short of a defense of insanity — that, even if the defendant caused the death, his personality structure prevented him from premeditating the crime or acting with malice aforethought. The defendant was aware of and approved the plan: he was insistent on claiming that he was "not guilty," and was against using an insanity defense. We agree with the motion judge that ineffectiveness of counsel is not shown under the regime of *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Counsel could well have concluded that even if the evidence provided some basis for an instruction on insanity — which may be seriously doubted — there was very little chance that the jury could be convinced; more plausible was the easier line that was taken; yet it failed.

Counsel was also charged with ineffectiveness for failing to seek instructions on involuntary manslaughter and to take timely steps to preserve and inspect the sailboat. These claims repeated in different form claims made on appeal from the conviction and are sufficiently dealt with above. See also note 11, *supra*.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*