# COMMONWEALTH *vs.* JOHN AGUIAR.

No. 09-P-1234.

Essex. April 14, 2010. - November 1, 2010.

Present: BERRY, VUONO, & HANLON, JJ.

*Indecent Assault and Battery. Practice, Criminal,* Trial of indictments together. *Evidence,* Credibility of witness, Impeachment of credibility, Cumulative evidence. *Witness,* Credibility, Impeachment.

At the trial of indictments charging the defendant with indecent assault and battery of two victims, the judge did not abuse his discretion in allowing the charges to be tried together, where, given the defendant's participation in two criminal episodes that were factually very similar, the defendant failed to demonstrate that the six and one-half year gap between the charged offenses rendered them unrelated, in that there was evidence of continuing abuse of the first victim, as well as evidence that during the period between the charged assaults, as the defendant's contact with the first victim diminished, he was cultivating a close relationship with the second and her mother; and where the defendant failed to demonstrate that the failure to sever the indictments was highly prejudicial to him. [198-204]

At the trial of indictments charging the defendant with indecent assault and battery of two victims, the judge erred in excluding a defense witness's proffered testimony about a counselling session following the second victim's accusation, where the testimony was offered not for its truth but to impeach the testimony of that victim's mother that, at that session, the defendant admitted to assaulting her daughter; however, the error was not prejudicial, where the excluded testimony would have been cumulative of the defendant's denial during his own testimony. [204-207]

This court reversed three convictions of indecent assault and battery where the Commonwealth conceded that the evidence at trial was not sufficient to prove the offenses charged. [207]

INDICTMENTS found and returned in the Superior Court Department on May 11, 2005.

The cases were tried before *Richard E. Welch, III*, J.

*J.W. Carney, Jr.*, for the defendant.

*Kenneth E. Steinfield*, Assistant District Attorney, for the Commonwealth.

HANLON, J. After a jury trial, the defendant, John Aguiar, was convicted of multiple sexual assaults involving two children, Lauren and Jane.[1] The jury found the defendant guilty of six counts of indecent assault and battery on Lauren, a child under the age of fourteen,[2] and four counts of indecent assault and battery on Jane, three as lesser included offenses of statutory rape. On appeal, the defendant argues that the charges were improperly joined for trial and that certain defense evidence was wrongfully excluded. We affirm the judgments on all but three indictments for which the Commonwealth concedes there was insufficient evidence.

*Facts.* We summarize facts that the jury could have found, reserving some details for later discussion. In 1993, the defendant and his wife, Susan Aguiar, lived in the town of Swampscott. Susan and her brother Eric both worked in the family business, Prime Poultry. Eric was Lauren's stepfather; he adopted Lauren and her older brother after he married their mother. In April, 1993, the defendant and his wife agreed that Eric and his pregnant wife, along with Lauren and her brother, would move into the Aguiar home, so that Eric and his family could save money to buy a house in Beverly.

The families were very close; they often spent holidays and attended family events together. At that time, the defendant and his wife had no children of their own, and they frequently took Lauren and her brother on outings and bought toys for them. Lauren was six years old and in kindergarten when her family moved into the defendant's home. She was twenty-one years old at the time of the trial, and she testified, "They were like the best aunt and uncle . . . . At that time, we did adore them and they adored us, too."

Shortly after Lauren's family moved in with the defendant, he began to pay more attention to her. One night, when everyone else was asleep, the defendant woke her up and led her into the kitchen. He sat on a chair at the kitchen table and pulled Lauren's pajamas down to her ankles. He whispered to her to be quiet, put his fingers "all over" her vagina, and asked if she

---

[1]Pseudonyms are used for the children, their mothers, and the defendant's son.

[2]The jury acquitted the defendant of one count of dissemination of obscene matter to Lauren, a minor.

"like[d] that." The defendant also pulled down his own pants and put his penis next to Lauren's vagina. He took Lauren's hand and put it on his penis, and with his hand on top of hers, showed her how to move her hand back and forth. The defendant occasionally moaned when Lauren touched him.

According to Lauren, "[t]he reason I, like, remember [this incident] so well is 'cause I think it was like tried again so much," and on this occasion "I remember, like, being so little and I, like, put my hands together like this (indicating) and I was like, please make it stop." She recalled that after that incident she would try to feign sleep when the defendant came for her during the night and that he would rub her chest to try and wake her up. Lauren's mother recalled finding the defendant asleep at the table between 3:00 and 4:00 A.M., when she got up to go to the bathroom.

Lauren specifically described a second incident that occurred in the master bedroom during the daytime when the defendant's wife was home. The defendant was on the bed with Lauren and he had a pornographic videotape playing in the video cassette recorder. The defendant had Lauren touch his penis with her hand, causing him to have an erection. Lauren testified that on other occasions in the master bedroom he would "play with his fingers" when he touched her vagina, and he would have her touch his penis and "show [her] what to do." Lauren described a number of additional incidents, and estimated that she was assaulted between nine and eleven times, mostly while she lived in the defendant's house. After Lauren and her family moved to Beverly in November, 1993, the assaults continued on a few occasions, when the defendant and his wife babysat for Lauren and her brother on weekends. There were no assaults after Lauren's family moved to Swampscott in February, 2000.

In June, 2000, when Lauren was thirteen years old, she disclosed the abuse to her mother, Helen. She and Helen were on their way to meet the defendant, who had already picked up Lauren's brother; the defendant was going to take the two children, alone, to a karate show, and Lauren told her mother that she did not want to go. Lauren explained that the defendant had molested her when she was six years old. At the time of the abuse, Lauren had not been sure whether it was right or wrong, but as she grew older she became "very well aware that that

whole time period was . . . very wrong." Lauren's mother testified as a first complaint witness.

Jane was born in May, 1993, and she was fifteen years old when she testified at trial. Her mother, Marjorie, was Susan's best friend. In Jane's earliest memories, she was aware that the defendant and Susan were very close to her mother, and that they all frequently spent time together. Jane loved Susan and the defendant and considered them to be family. The feelings appeared to be mutual; the defendant and Susan often took Marjorie and Jane with them on family vacations to Disney World and Six Flags, among other places.

Jane testified that, when she was between seven and nine years old, the defendant sexually assaulted her.[3] On one occasion, while Marjorie and Susan were out of the house and the defendant was taking care of Jane and his son, Mike,[4] Jane was lying on top of the defendant in the basement, and he brought her upstairs to his room and told her to lay on top of him quickly, without any pants, before Susan and Marjorie came home. She did as she was told. Susan and Marjorie came home and Jane got up. On another occasion, in the basement, when the defendant's son was present, the defendant put his hand inside Jane's pants and began to rub her clitoris with his fingers. Jane testified that this hurt. The defendant took her pants off, spread her legs so that he could open the lips of her vagina with his fingers, and "licked up and down." Jane testified that it felt good and she felt loved. She thought what he was doing was all right because the defendant regularly told her that he loved her. During the same event, Jane laid on the floor and the defendant "kissed both [her] butt cheeks." He lifted Jane's shirt and licked all over her chest. Throughout this assault, Mike was present and watching a show on television. These types of incidents happened every time Jane's mother and Susan went out.

The last time she was assaulted, Jane was trying to sleep in the guest room when the defendant came in and pulled down her pants and tried to put his penis into her vagina. She testified that it did not go beyond "[t]he lips" of her vagina. The defendant

[3]The relevant time period runs from May 14, 2000, until May 31, 2002.

[4]During the period of the assaults, the defendant's son was between the ages of twenty months and three years and eight months.

tried to make Jane touch his penis, but she pulled her hand away. The last incident occurred shortly before Lauren made her claim against the defendant.

The circumstances under which each of the assaults were brought to light overlap to some extent. After Lauren made the first disclosure to her mother, her parents made a decision not to confront the defendant but to distance themselves from him. At the time, Eric and Susan's father was ill, and as noted, Eric and Susan both worked together in the family business. The sexual assault allegations, however, led to the break-up of the family business.[5]

In 2002, at her mother's request, Lauren began to see a therapist because of her feelings of isolation and depression, related in part to the sexual abuse. At the fifth session, on May 21, 2002, Lauren disclosed the abuse to the therapist and he reported the incidents to what was then called the Department of Social Services. Three days later, a Swampscott police detective met with Lauren and her family, and several days after that, the detective attempted to speak with the defendant. Apparently, Lauren's family asked not to go forward with the case, or to put it on hold, at that time. On May 31, 2002, Susan called Marjorie, Jane's mother, crying hysterically and reporting that Lauren had accused her husband of sexually assaulting her. Jane, who was nine years old, remembers going with her mother to the defendant's home and hearing them say that Lauren had said something about the defendant.

Jane's mother testified that, once she learned of Lauren's allegations, the defendant no longer babysat for Jane when she visited with or worked for Susan. However, in all other respects, the relationship between the two families remained unchanged until January, 2004, when Jane overheard her mother tell her grandfather that she did not believe Lauren. When her grandfather left, Jane called her mother into her bedroom and told her, "[Lauren]'s not lying, he did that to me too." Jane was extremely upset and held a bucket because she thought she would vomit.

A week later, Marjorie told Susan that Jane told her the defend-

---

[5]Eric was fired; Susan became president of the company; Susan also filed a lawsuit alleging that Eric had stolen from the company. The company went out of business fifteen months after Susan took charge.

ant had assaulted her.[6] Several days later, in an attempt to salvage their friendship, Marjorie attended a counselling session at a psychologist's office in Weston along with the defendant and Susan. According to Marjorie, the defendant in that session "kept saying he was sorry and that he never penetrated her, and he was very upset, he was crying."

At trial, the defendant testified, and he denied all the allegations, including the inculpatory statement in the counsellor's office that Marjorie attributed to him. The defense theory was impossibility, presented primarily through the defendant's own testimony and that of his wife. Both the defendant and Susan testified that the defendant was "never" the only adult alone with either victim or even his own son; there was always another adult present or a babysitter. With respect to Lauren, this theory was supplemented with Susan's testimony that she was a light sleeper, and that nothing could have happened in the nighttime hours in 1993 without her hearing it. Susan and the defendant also testified the defendant suffered from sleep apnea that prevented him from waking up at night. Susan eventually conceded on cross-examination that there were times during the night in 1993 when the defendant would be out of the bedroom for ten or fifteen minutes and she did not know exactly what he was doing.

*Joinder.* The defendant argues that the trial judge abused his discretion when he allowed the sexual assault charges involving Lauren and Jane to be tried together, because the offenses were not related within the meaning of Mass.R.Crim.P. 9(a)(1), 378 Mass. 859 (1979).[7] Where offenses are related, "[t]he trial judge shall join the charges for trial unless he determines that joinder is not in the best interests of justice." Mass.R.Crim.P. 9(a)(3), 378 Mass. 859 (1979). Joinder is a matter committed to the sound discretion of the trial judge, *Commonwealth* v. *Sullivan*, 436 Mass. 799, 803 (2002), and "will not be reversed unless there has been 'a clear abuse of discretion.'" *Commonwealth*

---

[6]The disclosure destroyed their friendship; Marjorie lost her job at Prime Poultry, Susan's family business, and, shortly thereafter, was forced to declare bankruptcy.

[7]Rule 9(a)(1) provides: "Two or more offenses are related offenses if they are based on the same criminal conduct or episode or arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan."

v. *Pillai*, 445 Mass. 175, 180 (2005), quoting from *Commonwealth* v. *Walker*, 442 Mass. 185, 199 (2004).

There are two components to this inquiry: first, a determination whether the offenses are related and, second, a determination whether joinder will be unfairly prejudicial. "[T]o prevail on a claim of misjoinder, the defendant 'bears the burden of demonstrating [both components,] that the offenses were unrelated, and that prejudice from joinder was so compelling that it prevented him from obtaining a fair trial.' " *Commonwealth* v. *Pillai*, *supra*, quoting from *Commonwealth* v. *Gaynor*, 443 Mass. 245, 260 (2005).[8]

Relatedness turns on whether the offenses "are based on the same criminal conduct or episode or arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." Mass.R.Crim.P. 9(a)(1). In making this determination, a judge may consider factors such as factual similarities and closeness of time and location. See *Commonwealth* v. *Ferraro*, 424 Mass. 87, 89-90 (1997); *Commonwealth* v. *Delaney*, 425 Mass. 587, 594 (1997), cert. denied, 522 U.S. 1058 (1998); *Commonwealth* v. *Wilson*, 427 Mass. 336, 345 (1998); *Commonwealth* v. *Pillai*, *supra*. "Offenses are related if 'the evidence in its totality shows a common scheme and pattern of operation that tends to prove' each of the complaints." *Ibid.*, quoting from *Commonwealth* v. *Feijoo*,

---

[8]In his reply brief, citing language in *Commonwealth* v. *Jacobs*, 52 Mass. App. Ct. 38 (2001), the defendant insists that the "Commonwealth bears the burden of proving the joinder was harmless." The *Jacobs* case does not go so far; what the *Jacobs* court said was that "[w]here offenses have been *correctly* joined, the burden is on the defendant to show the existence of particular circumstances . . . that have prejudiced materially his right to a fair trial. . . . Where, conversely, offenses have been *misjoined*, the trial result cannot stand unless the error could be deemed harmless." (Emphasis in original.) *Id.* at 46. The court, citing a decision from the United States Court of Appeals for the First Circuit, went on to note that "the burden of demonstrating the harmlessness of *misjoinder* . . . is cast on the prosecution" (emphasis added). *Id.* at 46-47, citing *United States* v. *Randazzo*, 80 F.3d 623, 628 (1st Cir. 1996). The *Jacobs* court concluded that "for purposes of the present case it [did] not matter . . . just how the burden [was] cast," the offenses were misjoined. *Commonwealth* v. *Jacobs*, *supra* at 47. In any event, Massachusetts decisional law since *Jacobs* has explicitly and uniformly concluded that, in a claim of misjoinder, the defendant bears the burden of demonstrating that the offenses were unrelated. See, e.g., *Commonwealth* v. *Gaynor*, 443 Mass. 245, 260 (2005); *Commonwealth* v. *Pillai*, *supra*.

419 Mass. 486, 494-495 (1995). "There is no requirement that the circumstances of the cases be identical." *Commonwealth* v. *Gaynor*, *supra* at 261. In *Commonwealth* v. *Gaynor*, "[a]lthough the judge found that the similarities of the cases were not sufficiently strong to establish a signature mark to prove the identity of the killer," the court noted that "the circumstances of the cases were not offered for that purpose" and approved the trial judge's conclusion "that the circumstances of the cases were sufficiently similar to show that the defendant was acting pursuant to a common scheme, and were relevant to questions of his intent and motive." *Ibid.*

In *Commonwealth* v. *Feijoo*, the defendant was convicted of various sexual assaults for his actions with nine male victims, between the ages of twelve and seventeen, over a five-year time period. *Commonwealth* v. *Feijoo*, *supra* at 487-489. The court held the joinder of the thirteen indictments for trial was proper where "the evidence in its totality show[ed] a common scheme and a pattern of operation that tend[ed] to prove all the indictments." *Id.* at 494-495. As the court observed, "The evidence showed that the [victims] were the defendant karate teacher's students, and that the defendant used that relationship in each case to induce the [victims'] cooperation and submission to his desire for homosexual activity." *Id.* at 495. "Finally, the propriety of joining offenses for a single trial often turns on whether evidence of the other offenses would be admissible in separate trials on each offense." *Commonwealth* v. *Pillai*, 445 Mass. at 180.

In assessing the judge's exercise of discretion, "the test is not whether we would have made a different decision." *Id.* at 181. Instead, "we will uphold the judge's decision unless we are convinced that 'no conscientious judge, acting intelligently, could honestly have taken the view [he] expressed.' " *Ibid.* (citation omitted). Here, the facts demonstrate the defendant's participation in two criminal episodes that were factually very similar. In both cases, the defendant cultivated an extremely close relationship with each child and her family over a period of years before sexually assaulting her. Each of the victims testified that she loved and trusted the defendant and that she believed the defendant loved her. All the charged conduct took place in the defendant's home and involved the girls when they were between the

ages of six and nine. The assaults were very similar in nature and included the defendant putting his penis near each victim's vagina, manipulating each victim's vagina with his fingers, and touching their chests. He tried to persuade both girls to touch his penis, although only Lauren complied. He persuaded each child to lie prone, next to him and without pants. That there were some differences — for example, that the defendant licked only Jane's vagina but not Lauren's — does not render the otherwise factually similar assaults distinct. See *Commonwealth* v. *Wilson*, 427 Mass. at 345 ("our cases have allowed considerable differences with respect to . . . factual circumstances").

This case is different from *Commonwealth* v. *Jacobs*, 52 Mass. App. Ct. 38 (2001), on which the defendant principally relies. In *Jacobs*, the defendant chiropractor was convicted of indecent assault and battery on two adult women patients. *Id.* at 38-39. The court held that the alleged assaults were unrelated, and, quoting from *Commonwealth* v. *Gallison*, 383 Mass. 659, 673 (1981), distinguished the case from those where the crimes had a "temporal and schematic nexus," a nexus "which [the court found] notably lacking in the case at bar." *Commonwealth* v. *Jacobs*, *supra* at 41. Specifically, in *Jacobs*, one woman testified that the defendant improperly massaged her buttocks; the other woman testified that he improperly massaged the side of her breasts. *Id.* at 48-49. Each woman thereafter continued treatment with the defendant "without any cavil," *id.* at 49, and three years elapsed between the two sets of encounters. The court expressed considerable doubt whether evidence of one assault would be admissible in the trial of the other. *Id.* at 43-44.

In the present case, but for the six and one-half year gap between the charged offenses, there is little question that the two sets of assaults were sufficiently similar to constitute a series of connected criminal episodes that could be properly joined.[9] See, e.g., *Commonwealth* v. *Zemtsov*, 443 Mass. 36, 44-45 (2004); *Commonwealth* v. *Pillai*, 445 Mass. at 176-178

---

[9]We recognize, as defense counsel noted at oral argument, that, while rule 9 is taken largely from Fed.R.Crim.P. 8, the Federal rule is somewhat broader because it permits joinder of offenses if they "are of the same or similar character." Under rule 9, similarity is but one factor to be considered in deciding whether joinder is permitted, and rule 9, as opposed to the Federal rule,

(in one incident the defendant grabbed the breast and nipple of a thirteen year old girl who was sleeping over with his daughter in his basement; and in the second incident, months later, the defendant woke up another thirteen year old girlfriend of his daughter, who was sleeping over, and touched her breast and vaginal area, pressed his penis against her buttocks, and tried to pull off her pajama bottoms).

The defendant argues, with some force, however, that the six and one-half year hiatus between the sexual assaults that were charged was significant — so significant that, without more, it renders the offenses distinct and unrelated. He also argues that there was no conduct connecting the two victims. However, the intervening period between the charged assaults was not "eventless." First, there was, in fact, evidence of continuing abuse. Lauren testified that the abuse continued when she and her brother visited the defendant and his wife on weekends, after she moved to Beverly from the defendant's home in 1993. Those visits ended when her family moved to Swampscott in 2000.

In addition, the defendant's pattern of assaulting these children was completely dependent on establishing a close relationship with his victim and her family before exploiting her sexually. In this way, he was able to gain continued, unsupervised access to a very young child, in the privacy of his own home and over a significant period of time. During the period between the assaults, as his contact with Lauren diminished, the defendant was simultaneously cultivating a close relationship with Jane and her mother, one that he would later use to facilitate his sexual assaults on Jane.

Although "[f]actors such as time and location play an important role in determining whether offenses are related . . . , our cases have allowed considerable differences with respect to these factors and other factual circumstances." *Commonwealth* v. *Wilson,* 427 Mass. at 345, citing *Commonwealth* v. *Delaney,* 425 Mass. at 594. A particularly distinct pattern of conduct or criminal scheme could be sufficient, despite time differences, to establish relatedness in some circumstances. See *Commonwealth* v. *Mamay,* 407

requires that the related offenses "arise out of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." See generally *Commonwealth* v. *Pillai,* 445 Mass. at 182 n.10.

Mass. 412, 416-417 (1990); *Commonwealth* v. *Feijoo*, 419 Mass. at 494-495; *Commonwealth* v. *Pillai*, 445 Mass. at 182 & n.10. See also *Commonwealth* v. *Sharpe*, 454 Mass. 135, 143-144 (2009) (prior bad act evidence from seven years before the charged crime was not too remote to be probative, when, in the intervening period, the defendant engaged in a continuum of physical and verbal arguments progressing until the eventual use of a dangerous weapon — the charged act and the prior bad act at issue — to get what he wanted from a girlfriend). Considering all the facts, we are not persuaded that the judge abused his discretion in determining that the offenses were related, such that joinder was permissible.

The defendant bears the burden of demonstrating not only that the offenses were unrelated but also that "prejudice from joinder was so compelling that it prevented him from obtaining a fair trial." *Commonwealth* v. *Gaynor*, 443 Mass. at 260. See *Commonwealth* v. *Pillai*, 445 Mass. at 182-183; *Commonwealth* v. *Green*, 52 Mass. App. Ct. 98, 103-104 (2001). That inquiry includes consideration whether evidence of the other offenses would have been admissible at a separate trial on each indictment. See *Commonwealth* v. *Zemtsov*, 443 Mass. at 45; *Commonwealth* v. *Pillai*, 445 Mass. at 182-183 ("Nor can the defendant meet his burden of proving that any prejudice from joinder was so compelling that it prevented him from obtaining a fair trial, because evidence of one offense likely would have been admitted at a separate trial of the other").

In this case, Jane's disclosure of the abuse resulted, in part, from having overheard conversations concerning Lauren's disclosure; therefore, some evidence of Lauren's disclosures would be admissible at Jane's trial to explain "why the complaint was made at that particular time." *Commonwealth* v. *King*, 445 Mass. 217, 219 (2005), cert. denied, 546 U.S. 1216 (2006). In addition, after Jane's complaint was disclosed, that information was provided to Lauren's family, resulting in their decision to go forward with the prosecution. At least a cursory description of Jane's allegations would likely have been admissible at some point in Lauren's trial to explain the eleven-year delay.[10] See generally *id.* at 243.

---

[10]This is particularly likely in view of the fact that part of the defendant's

Most importantly, the facts of both cases illustrate a common method of operation, namely, the cultivation of a young girl's trust, and that of her family, eventually permitting the defendant to assault her sexually in his home for a period of months or years. "Because of the similarities, the evidence of the other offense would likely be admissible not only to show a common pattern of conduct, but also 'to corroborate[] the victim's testimony' and 'render[] it not improbable that the acts charged might have occurred.' " *Commonwealth* v. *Pillai,* 445 Mass. at 183, quoting from *Commonwealth* v. *King,* 387 Mass. 464, 472 (1982). It is also significant that the jury convicted the defendant only of the lesser included offense of the three most serious charges, statutory rape, and that they found the defendant not guilty of the dissemination count. Such a verdict is "a strong indication that a misjoinder of offenses has not resulted in any actual prejudice." *Commonwealth* v. *Green, supra* at 103. See *Commonwealth* v. *Delaney,* 425 Mass. at 595. Finally, the judge clearly and accurately instructed the jury that they must be unanimous with respect to the verdict on each count and also on their duty to consider each count separately. We presume the jury followed those instructions. In sum, the defendant has failed to demonstrate, as he must, that "the failure to sever [the offenses] was highly prejudicial to him." *Commonwealth* v. *Wilson,* 427 Mass. at 347.

*Exclusion of evidence.* Next, the defendant argues that the judge erred in excluding Susan's proffered testimony about what happened during the counselling session that followed Jane's accusation. Marjorie testified that she agreed to meet with Susan, the defendant, and the psychologist, and related that the defendant "kept saying he was sorry and that he never penetrated her, and he was very upset, he was crying." Susan's account was different; she testified, "We didn't get anywhere because [Marjorie] was infuriated at me that I would not listen to her in the respect of I didn't believe her. . . . [John] was heartsick. He was in tears, in tears that he would — he was shocked." Susan also testified, "I told [Marjorie] to look at the facts, that it's impossible, and she just didn't want to listen to me."

---

strategy was to suggest that Lauren's testimony was fabricated by her family as part of the family feud over Prime Poultry.

However, when defense counsel asked Susan, "[W]hat did [John] say, if anything?" the judge sustained the Commonwealth's objection to the question. At sidebar, defense counsel argued that he should be permitted to "impeach [Marjorie's] prior testimony that he said I didn't penetrate her, I'm sorry, I'm sorry, seven times by [Susan] being there and witnessing that didn't happen." The judge responded that the defendant could "take the stand and do that." He then ruled, without much further discussion, that Susan's testimony on the issue could not be admitted to impeach Marjorie's testimony that the defendant had made an admission.

The defendant himself testified that, during the meeting, Marjorie "came running to [him] . . . and saying how could you do that to [Jane]? And at that time, [he] just broke down crying and [he] said, 'How could you think that I would ever do anything like that to [Jane]? . . . I never touched her.' " He also testified specifically that he never made any statement such as the one that Marjorie described and that he was "[s]ick" over the accusation.

The Commonwealth argues that any testimony Susan would have offered about what the defendant said during the meeting was inadmissible hearsay. That argument misses the issue: Susan's testimony was not offered for the truth of what the defendant said in the meeting, but to impeach Marjorie's testimony that the defendant admitted to assaulting her daughter. It was error to exclude it. See *Commonwealth* v. *Fernandes*, 427 Mass. 90, 97 (1998), quoting from Liacos, Massachusetts Evidence § 6.6.1, at 268 (6th ed. 1994), citing *Hathaway* v. *Crocker*, 7 Met. 262, 266 (1843) ("Where the matter is relevant to an issue in the lawsuit and not merely to the credibility of the witness, extrinsic proof can always be offered to contradict"). See also Mass. G. Evid. § 801(c) note, Evidence Admitted for Nonhearsay Purpose, at 246-247 (2010).

Because there was an objection, we review the error to determine whether it was prejudicial. See *Commonwealth* v. *Alphas*, 430 Mass. 8, 23 (1999) (Greaney, J., concurring) ("The prejudicial [or harmless] error test . . . inquires whether there is a reasonable possibility that the error might have contributed to the jury's verdict"). Under the prejudicial error standard, the reviewing court must be able to say with fair assurance that the

error did not influence the jury, or had but very slight effect. *Commonwealth* v. *Silva*, 455 Mass. 503, 520 (2009), citing *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

Susan testified over a significant part of two days in a seven-day trial; her testimony occupied some 147 pages of the trial transcript.[11] She testified that her husband was never alone with Jane or any children; that he was never alone with Lauren during the time that her family lived in her house; and that he was never out of her sight with children in her home. She testified that nothing could have happened in her home that she did not know about, even while she was sleeping. She also testified at length about her belief that her brother, Lauren's father, was stealing from the family business and about Marjorie's inadequacies as an employee, maintaining that their actions, and not the children's accusations, were responsible for their estrangement and eventual firing from Prime Poultry. Throughout her testimony, Susan insisted that she did not believe the accusations, and that they could not have been true because there had not been a single opportunity to assault either girl during the thirty-one month period covered by the defendant's indictments.[12] In addition, both closing arguments focused almost exclusively on the credibility of the two alleged victims and the defendant. The prosecutor did not mention Marjorie's testimony that the defendant had made an admission. On the issue of Marjorie's credibility, defense counsel stated only, "I'll say this, if you find her credible and sincere, that merely means that she might believe her daughter. That doesn't mean that the indictments and the allegations are true."

Evaluating the evidence as a whole, it is clear that the excluded testimony, of the defendant's wife impeaching Marjorie, would have been cumulative. See *Commonwealth* v. *Talbot*, 444 Mass. 586, 590 (2005); *Commonwealth* v. *Brown*, 449 Mass. 747, 770 (2007); *Commonwealth* v. *Graham*, 62 Mass. App. Ct. 642, 648-649 (2004). The proffered statement from Susan, whose

---

[11]By contrast, Jane's testimony occupied only 117 pages; Marjorie's testimony, 116 pages; and Lauren's, 181 pages.

[12]The charged incidents were alleged to have occurred during a seven-month period from April, 1993, to November, 1993, and a twenty-four month period from May 14, 2000, to May 14, 2002.

testimony in this case clearly demonstrated an unassailable belief in her husband's innocence, would have added little to her husband's denial, and therefore would have had slight, if any, effect on the jury. We are persuaded that the error was not prejudicial.

*Sufficiency of the evidence.* The Commonwealth properly concedes that three indictments charging indecent assault and battery involving Lauren, nos. 007 through 009, must be reversed because the evidence was insufficient to show that on the specific occasions charged the defendant touched Lauren's vagina or breasts in his bedroom (indictment nos. 007 and 009) or that he touched her breasts in the kitchen (indictment no. 008).

Accordingly, the judgments on indictment nos. 007, 008, and 009 are reversed, those verdicts are set aside, and judgment shall enter for the defendant on those indictments. The remaining judgments are affirmed.

*So ordered.*